57 A.3d 425

## BALTIMORE COUNTY FRATERNAL ORDER OF POLICE LODGE NO. 4

v.

## BALTIMORE COUNTY, Maryland.

### No. 3, Sept. Term, 2012.

Court of Appeals of Maryland.

Nov. 19, 2012.

Reconsideration Denied Jan. 18, 2013.

534

Jeffrey L. Gibbs (Matthew Clash–Drexler and Raphael N. Rajendra of Bredhoff & Kaiser, P.L.L.C., Washington, DC), on brief, for petitioner.

James J. Nolan, Jr., Asst. Co. Atty. (Michael E. Field, Co. Atty. of the Baltimore County Office of Law, Towson, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

ADKINS, J.

The central issue in this appeal is whether a duty to arbitrate may survive expiration of the agreement that contains the arbitration clause. The seemingly[1] peripheral issue is who decides this question initially: the arbitrator or the court. An additional consideration lurking beneath the surface of these two questions, but necessary to their resolution, is when a dispute may be said to arise "under" an expired agreement so as to be arbitrable despite the agreement's expiration.

We now place these concepts into the context of this case. A collective-bargaining agreement between Baltimore County and Baltimore County Fraternal Order of Police, Lodge 4 ("FOP") contained an arbitration clause and a retiree health-insurance provision. FOP believed the provision locked in

---

1. We say "seemingly" because our analysis reveals that these two issues are intricately interrelated.

place the health-insurance subsidy, as it existed at the time of an officer's retirement. After the agreement expired and the County decreased the health-insurance subsidy, FOP initiated arbitration. The County protested, arguing that it had no duty to arbitrate because the collective-bargaining agreement had expired. The County also maintained that the health-insurance subsidy was not locked in place but was subject to change from year to year. FOP was successful in arbitration and on appeal before the circuit court, but the Court of Special Appeals vacated the arbitration award. FOP presents the following issues for our review:

1. Under Maryland's common law, should an arbitration clause in a collective bargaining agreement be enforced after that agreement's expiration when an otherwise arbitrable grievance is presented concerning vested rights that arise out of the collective bargaining agreement?

2. Does the common law of Maryland require the court or the arbitrator to determine the arbitrability of a postexpiration grievance arising out of a collective bargaining agreement containing an arbitration clause? [2]

We shall hold that an arbitration clause may survive the expiration of a collective bargaining agreement when it concerns rights that vested during the life of the agreement. We shall also hold that, when deciding the issue of arbitrability requires interpretation of the underlying agreement and consideration of the merits of the dispute, the issue of arbitrability should be initially determined by the arbitrator. The Circuit Court for Baltimore County properly granted summary judgment in FOP's favor. We thus reverse the Court of Special Appeals' judgment.

---

**2.** Baltimore County Fraternal Order of Police ("FOP") also poses a third question, stemming from the Court of Special Appeals' ruling: "Did the [the Court of Special Appeals] err in holding that—in the Arbitration Opinion and Award at issue in this litigation—the arbitrator failed to address the question of whether the arbitration clause had expired?" Our opinion resolves this issue in the course of addressing the County's arguments for vacating the arbitration award.

### FACTS AND LEGAL PROCEEDINGS

Baltimore County government employs approximately 8,000 employees. FOP has represented the County's 1,700 police officers for approximately 20 years. The County and FOP have been parties to a succession of one-year[3] collective bargaining agreements, called memoranda of understanding ("MOU"). These MOUs set forth the negotiated terms of conditions of employment for active and retired police officers. All MOUs contained an article on the grievance procedure, which provided—among other things—that all "grievances," including "[a]ny dispute concerning the application or interpretation of the terms of this [MOU]" that are not settled internally "shall be subject to binding arbitration."

#### 1992 Through 1995: No Mention of
#### Health Insurance in MOUs

In 1991, Baltimore County instituted a Retirement Incentive Program. As part of the Program, the County agreed to pay 90 percent of retirees' health insurance premium, while the retirees would pay the remaining 10 percent. Maintenance of this 90/10 split, however, was guaranteed only to officers who retired on or before January 31, 1992. The Incentive Program also made clear that employees retiring on or after February 1, 1992 would receive the same subsidy as active employees and that the subsidy could go up or down subject to future labor negotiations.

From February 1, 1992 to July 1, 1995, the MOUs made no reference to retiree health insurance. Officers who retired during that time received the same health-insurance premium split that active officers were receiving at that time.

#### 1995 Through June 30, 2007: Retiree
#### Health Insurance Provision

This changed with the 1995 negotiations for a new collective bargaining agreement, when FOP was able to negotiate the

---

3. There was, however, a four-year Memorandum of Understanding ("MOU") from July 1, 1987 to June 30, 1991, and no MOU between July 1, 1991 and June 30, 1994.

following health-insurance provision to be included in the MOU:

Section 7.13: Retiree Health Insurance–The County shall provide the same health insurance benefits ... to retirees under the age of sixty-five (65) as it does for active employees, at the time ... the employees retire[ ]. The health insurance subsidy at the time of retirement will remain in effect until the retiree or the retiree's surviving beneficiary reaches age sixty-five (65).[4]

This language remained in subsequent MOUs until 2004,[5] when the reference to "age sixty-five" was changed to eligibility for "Medicare": "The health insurance subsidy in place at the time of retirement shall remain in effect until the retiree becomes eligible for Medicare." Between February 1, 1992 and June 30, 2007, the health-insurance subsidy for active employees—and therefore retirees—remained at 85 percent.

### 2007 Decrease in Health–Insurance Subsidy and FOP's Grievance

In 2007, as part of its effort "to control escalating health care costs for County employees," the County negotiated a phased-in decrease in the health-insurance premium subsidy from 85 to 80 percent, which was to take effect gradually over the next five years.[6] On July 1, 2007, the County decreased the health-insurance premium split from 85/15 to 84/16 for retirees, as well active members.

---

4. Additionally, the 1995 MOU provided that this split was to apply retroactively to officers who retired between February 1, 1992 and July 1, 1995, which was the FY 1995 MOU's effective date.

5. The only change to the Retiree Health Insurance provision was the language concerning the retroactive application of the provision to retirees who retired between 1992 and 1995. That language was taken out in 2003.

6. The bargaining agent for FOP and other County unions, Health Care Review Committee ("HCRC"), agreed to this proposed change, but the FOP representative voted against it. The HCRC has been the collective bargaining agent on health care issues for various County unions, including the FOP, since 1987.

On September 14, the FOP filed a class grievance [7] on behalf of the officers who retired from February 1, 1992 to August 31, 2007, alleging that the 85/15 health-insurance subsidy split was a "lifetime promise" to those retirees, and that, as a result, those retirees were not subject to the decreased premium split.[8] On November 6, 2007, Labor Commissioner George Gay conducted a Grievance Appeal Hearing, and on November 17, he denied FOP's grievance. Gay believed that MOUs are "one-year agreements which are re-opened and renegotiated annually," and which, unlike pension benefits, do not create "vested rights."

FOP filed for arbitration. The arbitrator granted FOP's grievance, concluding that it was arbitrable even though the MOU had expired because the 85/15 health-insurance premium split was a "vested right" that "was not, and could not be, changed by the [subsequent] negotiations." Thus, the arbitrator ordered that the County (1) rescind the modification as applied to police officers who retired from 1995 to June 30, 2007, (2) continue the 85/15 split until those retirees became eligible for Medicare, and (3) reimburse them for wrongful deductions.

The County filed a Complaint to Vacate the Arbitration Award in the Circuit Court for Baltimore County. It argued, *inter alia,* that (1) the arbitrator lacked jurisdiction and exceeded his authority because the MOU containing the arbitration clause had expired, (2) "there was no agreement to arbitrate" because the MOU had expired, and (3) the award "involve[d] mistakes so gross as to constitute manifest injustice." The Circuit Court disagreed, however, and granted

---

7. On July 9, 2007, FOP also filed an Unfair Labor Practice Complaint challenging the County's refusal to bargain with it. That complaint was dismissed on the ground that HCRC was the bargaining agent for the FOP, and the County had not committed an unfair labor practice by refusing to negotiate with FOP directly after HCRC had approved of the change.

8. In FOP's view, "[o]nce an employee retires, their health insurance subsidy is locked in."

summary judgment in FOP's favor, refusing to vacate the Arbitration Award.

The County appealed. The Court of Special Appeals reversed the Circuit Court's grant of summary judgment in FOP's favor,[9] and FOP filed a petition for certiorari, which we granted. *Balt. Cnty. Fraternal Order of Police, Lodge No. 4 v. Balt. Cnty.*, 425 Md. 395, 41 A.3d 570 (2012).

## DISCUSSION

The first issue before us is whether an arbitration clause contained in an expired MOU survived the expiration of that MOU, making the dispute over the health-insurance premium split arbitrable. FOP argues that—even though the MOU expired—the County's decrease in health-insurance subsidy was an arbitrable grievance because "absent specific contractual evidence to the contrary, [a broad] arbitration clause survives expiration of the agreement and requires that disputes arising out of it, but after expiration of, the underlying agreement are arbitrable." The County argues the opposite: the arbitration clause was narrow, "FOP's grievance was based upon an MOU that no longer existed," and therefore the arbitrator had "no power, authority, or jurisdiction" to resolve the dispute. The parties also ask us to decide who determines this very issue: the arbitrator or the court.

## I.

### Arbitrability of a Grievance Arising After Expiration of a Collective–Bargaining Agreement

In deciding whether an arbitration clause may survive expiration of the agreement that gave it existence, the arbitrator

---

9. The Court of Special Appeals held that the arbitrator's Opinion and Award failed to consider a required factor: whether *"the arbitration clause itself had expired."* Reasoning that " '[v]ested' rights were necessary for arbitration, but so was the arbitration clause's survival despite the MOU's expiration," the court held that the Arbitration Award "should have been vacated." Notably, neither party made that argument before the Circuit Court or the Court of Special Appeals.

in this case relied extensively on two United States Supreme Court cases: *Nolde Bros. v. Bakery & Confectionery Workers Union,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977) and *Litton Fin. Printing Div. v. NLRB,* 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991). FOP and the County have also spent a considerable amount of time in their briefs discussing these cases. We accept the parties' invitation and examine *Nolde* and *Litton.*

### A. The Vesting Principles of Nolde and Litton

Both *Nolde* and *Litton* addressed arbitrability of a grievance arising after expiration of a collective-bargaining agreement. In *Nolde,* the agreement had a broad arbitration clause and provided for severance pay upon employment termination. 430 U.S. at 245, 97 S.Ct. at 1068–69. After the agreement's expiration, the bakery closed and refused to pay any severance. It maintained that "since severance pay was a creation of the collective-bargaining agreement, its substantive obligation to provide such benefits terminated with the Union's unilateral cancellation of the contract." *Id.* at 249, 97 S.Ct. at 1071. The bakery also resisted arbitration, arguing that "the duty to arbitrate ... must necessarily expire with the collective-bargaining contract that brought it into existence." *Id.* at 250, 97 S.Ct. at 1071. The Supreme Court disagreed: the "termination of a collective-bargaining agreement [does not] automatically extinguish[ ] a party's duty to arbitrate grievances arising under the contract." *Id.* at 251, 97 S.Ct. at 1071.

If that were true, the Court explained, there could be no arbitration of a dispute that "arose during the life of the contract but arbitration proceedings had not begun before termination" or if "arbitration processes began but were not completed, during the contract's term." *Id.,* 97 S.Ct. at 1072. Yet, in both of these instances, "the parties' contractual obligation to resolve such a dispute in an arbitral, rather than a judicial forum" would continue to exist even after the contract's expiration. *Id.* Thus, even though the dispute arose "*after* " the contract's expiration, because the parties' arguments were "based on their differing perceptions of a [con-

tract's] provision," the dispute arose *"under"* that contract, and as such, was arbitrable.[10] *Id.* at 249, 255, 97 S.Ct. at 1071, 1074.

Almost two decades later, in *Litton,* the Court reaffirmed that "[w]e presume as a matter of contract interpretation that the parties did not intend a pivotal dispute resolution provision to terminate for all purposes upon the expiration of the agreement." 501 U.S. at 208, 111 S.Ct. at 2226. The Court further delineated three circumstances in which a post-expiration grievance may be considered to arise under the expired contract: (1) where the grievance "involves facts and occurrences that arose before expiration, [2] where an action taken after expiration infringes a right that accrued or vested under the agreement, or [3] where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Id.* at 206, 111 S.Ct. at 2225.

### B. The Applicability of the Nolde/Litton Vesting Principles in Maryland

FOP urges us to adopt *Nolde's* reasoning, arguing that *Nolde* is directly on point and in accordance with our decisions and the decisions of other Maryland courts. It maintains that adopting *Nolde's* vesting principles would be consistent with

---

**10.** In reaching that conclusion, the Court observed: "the parties' obligations under their arbitration clause survived contract termination when the dispute was over an obligation arguably created by the expired agreement." *Nolde Bros. v. Bakery & Confectionery Workers Union,* 430 U.S. 243, 252, 97 S.Ct. 1067, 1072, 51 L.Ed.2d 300 (1977) (citing *John Wiley & Sons v. Livingston,* 376 U.S. 543, 555, 84 S.Ct. 909, 917, 11 L.Ed.2d 898 (1964)). The Court went on to hold that "where the dispute is over a provision of the expired agreement, the presumptions favoring arbitrability must be negated or by clear implication." *Id.* at 255, 97 S.Ct. at 1074. The Court explained:

The parties must be deemed to have been conscious of [the] policy [favoring arbitration]. Consequently, the parties' failure to exclude from arbitrability contract disputes arising after termination, far from manifesting an intent to have arbitration obligations cease with the agreement, affords a basis for concluding that they intended to arbitrate all grievances arising out of the contractual relationship. *Id.*

our treatment of broad arbitration clauses as encompassing any and all disputes not specifically excluded, *NSC Contractors, Inc. v. Borders,* 317 Md. 394, 403, 564 A.2d 408, 412 (1989), and as severable from the rest of the agreement, *Holmes v. Coverall N. Am.,* 336 Md. 534, 547, 649 A.2d 365, 371 (1994). FOP also directs our attention to several cases in which this Court and the Court of Special Appeals have looked for guidance to federal courts in arbitration cases, including *NSC Contractors,* 317 Md. at 403, 564 A.2d at 412, *Gold Coast Mall v. Larmar Corp.,* 298 Md. 96, 104–05, 468 A.2d 91, 95–96 (1983), and *Mayor of Balt. v. Balt. City Fire Fighters, Local 734,* 49 Md.App. 60, 65, 430 A.2d 99, 102 (1981). Moreover, FOP provides a table with over a dozen cases from other states relying on *Nolde* to hold that disputes arising after an agreement's expiration but arising under it may be arbitrable.

On the contrary, the County argues that we should not adopt *Nolde,* challenging *Nolde's* applicability and insisting that *Nolde* "is simply not good law," [11] and that "its holding is imprecise and embraces ... disparate, inconsistent propositions." The County contends "[t]here is a sufficient body of Maryland common law" on the interpretation of arbitration agreements. It also maintains that *Nolde* and *Litton* are not applicable here because they involved the National Labor Relations Act, 29 U.S.C. § 152(2) ("NLRA"), from which labor relations between local governments and their employees are excepted.

---

11. For this proposition, the County cites Frank Elkouri & Edna Asper Elkouri, *How Arbitration Works* 134 (6th Ed.2003), who wrote: "The majority of federal courts have read *Nolde* narrowly, holding that for a grievance to be arbitrable, after the expiration of the contract, it must involve either rights that have accrued or vested during the term of the agreement, or disputes that arose under the agreement while it was still in effect." We are of the opinion that the vagueness of *Nolde* concerning whether a dispute arose "under" the expired agreement—if any—was cured by *Litton,* which set forth the three situations when contract disputes arising after the agreement's expiration may still be arbitrable. *See Nolde,* 430 U.S. at 249, 97 S.Ct. at 1071; *Litton Fin. Printing Div. v. NLRB,* 501 U.S. 190, 206, 111 S.Ct. 2215, 2225, 115 L.Ed.2d 177 (1991).

We find the County's arguments unconvincing. We are aware of no Maryland case applying Maryland law in a situation like this, where the agreement containing an arbitration clause has expired, but a party seeks to arbitrate a dispute it alleges arises under that agreement. *Nolde* and *Litton*, however, provide clear guidance on this issue. Also, even though *Nolde* and *Litton* involved NLRA, that fact did not play a role in the Court's reasoning in either of the two cases. The applicability of *Nolde* and *Litton's* vesting principles to disputes not involving NLRA is further evidenced by the acceptance of the Court's reasoning in these two cases by many state courts. *See, e.g., Ahtna, Inc. v. Ebasco Constructors, Inc.*, 894 P.2d 657, 663 (Alaska 1995) (applying the *Nolde* vesting principle in the context of a joint-venture agreement); *Ajida Techs., Inc. v. Roos Instruments, Inc.*, 87 Cal.App.4th 534, 104 Cal.Rptr.2d 686, 694–95 (2001) (relying on *Nolde* in holding that parties' obligations to arbitrate may survive expiration of a marketing and development agreement); *Shams v. Howard*, 165 P.3d 876, 879 (Colo.App.2007) (applying *Litton's* vesting principles to the vesting of rights under an expired warranty agreement); *Auchter Co. v. Zagloul*, 949 So.2d 1189, 1194 (Fla.Dist.Ct.App.2007) (following the guidance of *Nolde* and *Litton* in deciding arbitrability of a dispute arising under an expired construction contract); *Homes by Pate, Inc. v. DeHaan*, 713 N.E.2d 303, 309 (Ind.Ct.App.1999)(relying on *Nolde* in holding that "a logical reading of the [residential building] warranty leads to the conclusion that, so long as a defect has occurred within the . . . warranty coverage, any dispute concerning that coverage must be arbitrated").

Indeed, the Massachusetts high court has applied the *Nolde* vesting principles in a situation very similar to this case. *See Boston Lodge 264, Dist. 38, Int'l Ass'n of Machinists & Aerospace Workers v. Mass. Bay Transp. Auth.*, 389 Mass. 819, 452 N.E.2d 1155 (1983). In *Boston Lodge 264*, the collective-bargaining agreement between the union and Massachusetts Bay Transportation Authority ("MBTA") called for cost-of-living adjustments benefitting union members. *Id.* at

1156. The same agreement also provided for binding arbitration of any disputes arising under the agreement. *Id.* When the agreement expired and MBTA failed to make the adjustments, the union initiated arbitration. MBTA refused to arbitrate, arguing that the dispute was not arbitrable because the collective bargaining agreement had expired. *Id.* Relying on *Nolde,* the Supreme Judicial Court of Massachusetts held that the dispute was arbitrable:

> Although the term of the collective bargaining agreement had ended, there continued both a contractual obligation to make cost-of-living adjustments under certain conditions and an agreement to arbitrate any unresolved grievance arising out of the agreement. The fact that the term of a collective bargaining agreement has expired does not mean there can be no duty to arbitrate issues arising out of that agreement, where the agreement includes obligations extending beyond its term and where there is a broadly expressed agreement to arbitrate grievances arising out of that agreement.

*Id.* (citing, among others, *Nolde,* 430 U.S. at 254–55, 97 S.Ct. at 1073–74).

■ Following in the footsteps of our sister states, we adopt the *Nolde/Litton* vesting principles and hold that a broad arbitration clause may survive expiration of the underlying agreement when the dispute arises under the agreement. This may happen when the dispute (1) "involves facts and occurrences that arose before expiration" of the agreement, (2) where the rights that are the subject of the dispute "accrued or vested" during the life of the agreement, or (3) "where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Litton,* 501 U.S. at 206, 111 S.Ct. at 2225.

Our acceptance of the *Nolde* and *Litton* vesting principles in this situation is not inconsistent with our reliance on the Supreme Court for guidance in other arbitration cases, many of which are interlaced with the Supreme Court's reasoning.

In addition to the Maryland cases cited by FOP, reproduced above, we have followed the lead of the Supreme Court in *Holmes,* when we held an arbitration clause to be severable from the rest of the contract, 336 Md. at 541–42, 649 A.2d at 368 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)); in *Curtis G. Testerman Co. v. Buck,* when we concluded that a non-party to an arbitration agreement may not be compelled to arbitrate, 340 Md. 569, 584, 667 A.2d 649, 656 (1995) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 20, 103 S.Ct. 927, 939, 74 L.Ed.2d 765 (1983)); and in *Messersmith, Inc. v. Barclay Townhouse,* when we held that the issue of whether there was an agreement to arbitrate was to be decided by the court, not the arbitrator, 313 Md. 652, 661 & n. 3, 547 A.2d 1048, 1052 & n. 3 (1988) (citing *John Wiley & Sons, Inc.v. Livingston,* 376 U.S. 543, 547, 84 S.Ct. 909, 913, 11 L.Ed.2d 898 (1964) and *AT & T Techs., Inc. v. Commc'ns Workers,* 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)).

## II.

### Who Decides Validity of Arbitration Clause in an Expired Agreement: the Arbitrator or the Court

The second issue before us is who decides whether an arbitration clause survives expiration of the underlying agreement, or using *Nolde's* and *Litton's* terms, whether the grievance concerns a right that arose or vested under an expired agreement. *Nolde* and *Litton* reached conflicting conclusions on this issue. Under *Nolde,* to determine that a dispute is arbitrable, the court only needs to recognize—without deciding—that the merits of the dispute depend on the interpretation of the agreement.[12] *See* 430 U.S. at 249, 97 S.Ct. at 1071.

---

**12.** The *Nolde* court stated: "Of course, in determining the arbitrability of the dispute, the merits of the underlying claim for severance pay are not before us. However, it is clear that, whatever the outcome, the resolution of that claim hinges on the interpretation ultimately given

But the ultimate "question of interpretation of the collective bargaining agreement is a question for the arbitrator." [13] 430 U.S. at 253, 97 S.Ct. at 1073 (citation omitted).

In contrast, the *Litton* Court held that courts "must determine whether the parties agreed to arbitrate this dispute, and we cannot avoid that duty because it requires us to interpret a provision of a bargaining agreement." 501 U.S. at 209, 111 S.Ct. at 2227.

Considering ample Maryland authority on the issue of who decides whether a dispute is arbitrable, we find it unnecessary to attempt to resolve the conflict between *Nolde* and *Litton* [14] or adopt reasoning of either of the two cases, and instead look to our own jurisprudence for guidance on who—the arbitrator or the court—decides arbitrability of a dispute allegedly aris-

---

the contract clause providing for severance pay." 430 U.S. at 249, 97 S.Ct. at 1071.

**13.** The Court reasoned that the issue was for the arbitrator because "[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Nolde*, 430 U.S. at 253–54, 97 S.Ct. at 1073 (quotation marks omitted) (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960)).

**14.** This tension between *Nolde* and *Litton* is borne out by the dissenting Justices Stevens, Marshall, Blackmun, and Scalia, who argued that, like in *Nolde*, the *Litton* majority should have left the arbitrability issue "reaching the merits" of the dispute "to an arbitrator in the first instance, pursuant to the broad agreement of the parties to submit for arbitration any dispute regarding contract construction." *Litton*, 501 U.S. at 218, 111 S.Ct. at 2231–32 (Stevens, J., dissenting) (Blackmun & Scalia, JJ., joining); *id.* at 211, 111 S.Ct. at 2228 (Marshall, J., dissenting) (Blackmun & Scalia, JJ., joining). Justice Marshall emphasized that in *Nolde*, the Court "carefully avoided expressing any view as to whether the substantive provisions of the expired agreement had any posttermination effect precisely because the parties had expressed their preference for an arbitral, rather than a judicial interpretation." *Id.* at 213–14, 111 S.Ct. at 2229. In contrast, the *Litton* approach "invites protracted litigation about what rights may 'accrue' or 'vest' under the contract—litigation aimed solely at determining whether the dispute will be resolved by arbitration." *Id.* at 214, 111 S.Ct. at 2229.

ing under an expired agreement.[15]

## A. Arbitrability As a Threshold Issue

We begin this part of the analysis by reiterating that in Maryland arbitration has often been referred to as a "favored" method of resolving disputes, as it is considered "generally a less expensive and more expeditious means of settling litigation and relieving docket congestion." [16] *Walther v. Sovereign Bank*, 386 Md. 412, 425, 872 A.2d 735, 743 (2005). In accordance with the public policy favoring arbitration, the courts' role in the arbitration process—whether ruling on motions seeking to compel or stay arbitration or reviewing arbitration awards—is limited. Indeed, before a court can set aside an arbitration award, there must be "fraud or . . . misconduct, bias, prejudice, corruption or lack of good faith on the part of the arbitrator," or if "it was not within the scope of the issues submitted to arbitration," or involved a "mistake so gross as to work manifest injustice." *Bd. of Ed. v. Prince George's Cnty. Educators' Ass'n.*, 309 Md. 85, 100–01, 522 A.2d 931, 938–39 (1987) (citations omitted).

The only circumstance in which courts play a leading role in cases involving arbitration is in deciding arbitrability of a dispute. Courts have a prerogative in that instance "because the existence of an agreement to arbitrate is a threshold issue, [and] the courts must have authority to assess, independently of the arbitrator's point of view, whether or not the parties ever reached such an agreement." *Messersmith, Inc.*, 313 Md. at 660, 547 A.2d at 1052. As this Court noted more

---

**15.** The Circuit Court recognized that "[w]hile the Supreme Court's language [in *Litton* ] expresses a fairly clear standard that is applicable to the facts of the case," the *Litton* Court's holding with respect to who (the arbitrator or the court) decides the mixed issue of arbitrability and the merits of a dispute contradicts the Maryland law.

**16.** This may be particularly true in labor disputes because labor arbitrators often have more expertise in those matters than do courts. *See United Steelworkers of Am.*, 363 U.S. at 582, 80 S.Ct. at 1353 ("The ablest judge cannot be expected to bring the same experience and competence [as a labor arbitrator] to bear upon the determination of a grievance, because he cannot be similarly informed.").

than sixty years ago, "[t]he question [of arbitrability] is one of intention. . . . No one is under a duty to resort to [arbitration] tribunals, however helpful their processes, except to the extent that he has signified his willingness." *Id.* at 658, 547 A.2d at 1051 (quoting *Cont'l Milling & Feed Co. v. Doughnut Corp.,* 186 Md. 669, 675, 48 A.2d 447, 450 (1946)).

■ Even in deciding arbitrability issues, however, "courts are limited to determining only one thing: whether a valid arbitration agreement exists" and must be careful not to "stray into the merits of any underlying agreements." *Cheek v. United Healthcare of the Mid–Atl., Inc.,* 378 Md. 139, 155, 159–60, 835 A.2d 656, 666–68 (2003); *Holmes,* 336 Md. at 546, 649 A.2d at 370–71 ("The scope of the court's involvement extends only to a determination of the existence of an arbitration agreement."); *see also Gold Coast Mall,* 298 Md. at 103–04, 468 A.2d at 95 (stating the same limited scope of review under the Maryland Uniform Arbitration Act). This is not so difficult when parties disagree on issues "relating to the formation of the arbitration agreement, . . . such as a claim of novation, or an allegation that the agreement is void for lack of mutual consent."[17] *Holmes,* 336 Md. at 540, 649 A.2d at 367–68 (quoting *Holmes v. Coverall N. Am.,* 98 Md.App. 519, 530, 633 A.2d 932, 937 (1993), *aff'd,* 336 Md. 534, 649 A.2d 365 (1994)).

### B. When Arbitrability and Merits Overlap

■ Avoiding the merits of the dispute or the underlying agreement becomes more difficult in cases where the very arbitrability of the dispute overlaps with its merits. This may happen (1) when the parties have agreed to arbitrate, but the scope of the arbitration clause is unclear, making it necessary

---

17. To illustrate, in *Messersmith, Inc. v. Barclay Townhouse,* the parties disputed the very existence of the agreement to arbitrate, arguing that the construction contract containing the arbitration clause had not been signed. 313 Md. 652, 656, 547 A.2d 1048, 1050 (1988). Determining the arbitrability of a dispute regarding the scope, quality of work of the contractor, and the payment for its services did not require consideration of the contract as a whole or deciding the merits of dispute. *Id.*

to interpret the entire contract, *Gold Coast Mall,* 298 Md. at 107–08, 468 A.2d at 97; or (2) when a party challenges the validity of an arbitration clause based on some irregularity of the entire contract, which also requires inquiring into the merits of the dispute, *Holmes,* 336 Md. at 534, 649 A.2d at 365. These types of arbitrability challenges may involve "issues arising after the formation of the arbitration agreement, ... such as rescission, fraud in the inducement, waiver, and termination of the contract." *Id.,* 649 A.2d at 368. In those circumstances, "[w]hether the party seeking arbitration is right or wrong is a question of contract application and interpretation for the arbitrator, not the court, ... and the court should not deprive the party seeking arbitration of the arbitrator's skilled judgment by attempting to resolve the ambiguity." *NRT Mid–Atl., Inc. v. Innovative Props., Inc.,* 144 Md.App. 263, 281, 797 A.2d 824, 834 (2002) (citation omitted).

We have distinguished arbitrability issues that require interpretation of the entire contract from those that do not depend on the merits of the dispute in *Gold Coast Mall,* where the lease agreement contained conflicting language. 298 Md. at 100, 468 A.2d at 93. On the one hand, there was a broad arbitration clause requiring the parties to arbitrate any disputes arising out of the contract; on the other hand, other clauses in the contract provided the landlord with rights and remedies other than arbitration. *Id.* Appreciating the difficulty of deciding arbitrability under those facts, we identified three sets of circumstances involving arbitrability issues and explained their proper treatment by the courts:

Where the language of the arbitration clause is clear, and it is plain that the dispute sought to be arbitrated falls within the scope of the arbitration clause, arbitration should be compelled. If it is apparent, on the other hand, that the issue sought to be arbitrated lies beyond the scope of the arbitration clause, the opposing party should not be compelled to arbitration, since there is no agreement to arbitrate.... A problem is created for the court when the language of the arbitration clause is unclear as to whether

the subject matter of the dispute falls within the scope of the arbitration agreement. Courts that have considered this problem have recognized that under such circumstances the question of substantive arbitrability initially should be left to the decision of the arbitrator, not the courts.

*Id.* at 104–05, 468 A.2d at 95–96 (citing a long line of cases from other states). Unable to resolve the arbitrability issue without considering the lease agreement as a whole, we held that the "question of substantive arbitrability should be left to the decision of the arbitrator." *Id.* at 108, 468 A.2d at 97.

We took the same approach in *Holmes,* 336 Md. 534, 649 A.2d 365. There, a franchisee attempted to avoid arbitration, alleging fraudulent inducement and violations of the Franchise Act in an agreement with a broad arbitration clause. *Id.* at 537, 541, 649 A.2d at 366–67, 368. Stressing the difference between "the issue of the validity of an arbitration agreement in a contract" and "the merits of a dispute under such a contract," we observed that the franchisee did not allege that he "was fraudulently induced into agreeing to arbitrate disputes or that the parties did not agree to arbitrate this type of dispute." *Id.* at 545–46, 649 A.2d at 370–71. Rather, we emphasized, the allegations of fraudulent inducement "go to the validity of the contract as a whole." *Id.* at 546, 649 A.2d at 371. As such, "[t]hese claims run to the merits of the dispute between the parties and do not suggest a 'substantial and bona fide dispute' as to the actual existence of an arbitration agreement between the parties." *Id.* We concluded that because the party resisting arbitration "has not alleged fraud in the inducement as to the arbitration clause itself or that the parties did not intend to arbitrate this type of a dispute, ... the underlying dispute is one for the arbitrator." *Id.* at 547, 649 A.2d at 371.

■ Our intermediate appellate court considered the overlap of the arbitrability issue with the merits of the underlying agreement under the circumstances even more similar to this case in *Nowak v. NAHB Research Center, Inc.,* 157 Md.App. 24, 848 A.2d 705 (2004). There, former employees sought to

stay arbitration of their employer's claims after termination of their employment. *Id.* at 30, 848 A.2d at 709. The employer relied on the arbitration clause in the employment agreements, which required that any "dispute arising out of or relating to" the contracts be subject to arbitration. *Id.* at 28, 848 A.2d at 708. The employees argued, however, that their duty to arbitrate under the contract expired upon termination of their employment. Finding such arguments to implicate the merits of the case, the Court of Special Appeals refused to decide the arbitrability issue:

> [I]t is clear that a mutually agreed upon arbitration provision existed in the Contract.... Rather, [employees] argue that the arbitration agreement ... was no longer valid once they were terminated as employees.... [T]his argument clearly goes to the merits of the contract as a whole and is a question for the arbitrator to decide.

*Id.* at 34, 848 A.2d at 711. Thus, while "the validity of an arbitration agreement" is an issue for the courts, which a circuit court reviews anew, "the merits of the contract itself" are for the arbitrator's consideration, subject only to a deferential standard of review. *Id.* at 33–34, 848 A.2d at 711; *see also Holmes,* 336 Md. at 534, 649 A.2d at 365.

## C. The Arbitrability of FOP's Grievance

■ With these principles in mind, we turn to the arbitrability issue in this case.[18] If one could decide that FOP's grievance was arbitrable without interpreting the underlying MOU or addressing the merits of FOP's claims, the arbitrability issue in this case was an issue for the court to decide initially. But if the arbitrability issue cannot be so decided, it was within the arbitrator's purview.

---

**18.** Arbitration agreements in Maryland are governed by common law, unless they expressly provide that the Maryland Uniform Arbitration Act ("MUAA") should apply. *See* Md.Code (1974, 2006 Repl. Vol.), § 3–206(b) of the Courts and Judicial Proceedings Article. Because the MOU here did not expressly provide that MUAA applies, common law principles guide our inquiry.

The arbitration clause here was part of the 2006–2007 MOU. It defined as a "grievance" "[a]ny dispute concerning the application or interpretation of the terms of [the MOU]" and subjected to "binding arbitration" any "grievance" that was not settled through other internal mechanisms. The same MOU that contained the arbitration clause also stated that "[t]he County shall provide the same health insurance benefit plans offered to active employees for retirees not eligible for Medicare.... The health insurance subsidy in place at the time of retirement shall remain in effect until the retiree becomes eligible for Medicare." The MOU expired on June 30, 2007.

Before the arbitrator, the Circuit Court, and the Court of Special Appeals, the County painted a black and white picture of the arbitrability—or, rather, non-arbitrability—of FOP's grievance, arguing that the MOU's expiration rendered inapplicable the arbitration clause.[19] As far as the County was concerned, FOP had "nothing to arbitrate because [it] ha[d] no agreement, there was no agreement in existence at the time this grievance was filed."[20]

---

**19.** The County did not address the arbitrability issue in its brief before us, arguing that "[t]he argument presented in FOP's Brief relates to a completely different question from that posed in its Petition for Writ of Certiorari. In its Questions Presented, it focuses on whether the court or the arbitrator determine arbitrability. In its Argument, it contends that the arbitrability should be determined without regard to the merits." We see no meaningful difference between FOP's Questions Presented and its arguments. As we explained above, typically when deciding whether a dispute is arbitrable requires considering the merits of the dispute, the arbitrability issue is for the arbitrator to decide. Thus, the distinction pointed out by the County is superficial.

**20.** The County also argued before the Circuit Court that "[t]he duty to arbitrate 'is a matter of contract,' and any duty here is created by the Memorandum of Understanding.... The agreement died on June 30, 2007. The grievance filed here on September 14, 2007 fails as a matter of law because the contract expired." The County continued to argue before the Court of Special Appeals:

> FOP's grievance was based upon an MOU which no longer existed. Thus, the Arbitrator in this matter had no power, authority or jurisdiction to arbitrate a grievance which occurred after the expira-

FOP responds that the arbitrability issue is not that simple. It contends that the MOU's expiration does not determine the arbitrability of its grievance, but that the arbitrability depends on whether the retiree health-care clause quoted above and other clauses "in each of the MOUs governing retirements between 1992 and 2007 ... reflect binding and irrevocable promises by the County to provide the retiree health insurance subsidy in effect at the time of [the officers'] retirement."

Although the County's approach to the arbitrability issue presents a clear-cut syllogism, it is based on a faulty premise. First, the arbitration clause in question subjected to arbitration "any dispute concerning the application or interpretation of this Memorandum of Understanding." As this clause "call[ed] for the arbitration of ... any and all disputes arising out of the contract," it is a broad arbitration clause,[21] and generally, "[w]here there is a broad arbitration clause, ... all issues are arbitrable unless expressly and specifically excluded."[22] *Gold Coast Mall,* 298 Md. at 104, 468 A.2d at 95; *accord NSC Contractors, Inc.,* 317 Md. at 403, 564 A.2d at 412; *Crown Oil & Wax Co. of Del. v. Glen Constr. Co. of Va.,* 320 Md. 546, 560, 578 A.2d 1184, 1190 (1990). Since the arbitra-

tion of the MOU. He had no jurisdiction and the grievance was not arbitrable.

**21.** The County insists that the arbitration clause in question is narrow, but the language of the arbitration clause supports the opposite conclusion. The County concedes that "the grievance filed by FOP ... falls within [the] definition of a grievance," but argues that the grievance procedure set forth in the MOU "limit[ed] the Arbitrator's role to resolving the dispute concerning application and interpretation of the MOU and prohibit[ed] the Arbitrator from ... rewriting the MOU."

Even if the MOU somehow limited the arbitrator's authority in deciding disputes, this "limiting" language did not narrow the scope of arbitrable disputes arising out of "the application or interpretation" of the MOU's terms: "Any dispute concerning the application or interpretation of the terms of this Memorandum of Understanding ... shall be subject to binding arbitration." Thus, we reject the County's argument that the arbitration clause here is narrow.

**22.** There is no doubt that, if this dispute had arisen during the MOU's lifetime, it would have been arbitrable. But in light of the MOU's expiration, the clause's continued vitality is not so clear.

tion clause was not limited to disputes arising during the MOU's term, we reject the County's argument that the MOU's expiration necessarily abrogated this broad arbitration clause.

Second, the County's logic fails because it is well-established in Maryland that "an arbitration clause is a severable contract which is enforceable independently from the contract as a whole." *Cheek*, 378 Md. at 165, 835 A.2d at 671–72 (quoting *Holmes*, 336 Md. at 545, 649 A.2d at 370). Indeed, our prior cases illustrate that it is possible for an arbitration clause to be enforceable even though the contract that contains it may not be valid. *See Holmes*, 336 Md. at 547, 649 A.2d at 371 ("By enforcing the arbitration agreement, we merely hold that the mutual promises to arbitrate constitute a separate agreement contained in the contract in question and that the arbitration clause itself is not in dispute. The validity of the contract as a whole is a question left for the arbitrators."); *see also Nowak*, 157 Md.App. at 33–34, 848 A.2d at 711. Accordingly, even though the MOU had expired, the arbitration clause was not necessarily unenforceable.

Quite the opposite, *Nolde* and *Litton* teach us that a dispute arising after the expiration of an agreement may be arbitrable if it arises under that agreement. *See Nolde*, 430 U.S. at 249, 97 S.Ct. at 1071. Such a dispute will be arbitrable if (1) the grievance "involves facts and occurrences that arose before expiration, [2] where an action taken after expiration infringes a right that accrued or vested under the agreement, or [3] where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Litton*, 501 U.S. at 206, 111 S.Ct. at 2225.

Under the *Nolde* and *Litton* vesting principles, FOP's grievance is arbitrable if the rights that are the subject of FOP's grievance vested during the MOU's term. As FOP's arguments underscore, in its view, the health-insurance clauses contained in the respective MOUs "reflect binding and irrevocable promises by the County" to maintain the 85/15 split, but in the County's view, they did not. Thus, as in *Nolde*, where

"the resolution of [Nolde's] claim hinges on the interpretation ultimately given the contract clause providing for severance pay," 430 U.S. at 249, 97 S.Ct. at 1071, in this case "[t]he parties' dispute regarding the vesting of retiree health benefits ... arises from conflicting interpretations of the retiree health care provision of the MOUs."

Accordingly, in this case, whether the retirees' rights to the 85/15 split vested during the MOU's term provides both the answer to the arbitrability issue **and** the merits of FOP's grievance. If one determines that the retirees' rights vested, then in accordance with the *Nolde* and *Litton* vesting principles, one would have to determine that FOP's grievance was arbitrable. But if one decided that the retirees' rights did not vest, one would have to conclude that FOP's grievance was not arbitrable. This analysis, however, hinges on the interpretation of the MOU, and the outcome depends on the meaning of the health-insurance premium provision.

As we discussed above, Maryland's arbitrability precedents prohibit courts from considering the merits of the dispute. *See Cheek,* 378 Md. at 154, 835 A.2d at 665 (refusing to "stray[ ] into the prohibited morass of the merits of the claims"); *Gold Coast Mall,* 298 Md. at 100, 104–05, 468 A.2d at 93, 95–96 (leaving the arbitrability issue to the arbitrator when "the language of the arbitration clause is unclear as to whether the subject matter of the dispute falls within the scope of the arbitration agreement"); *Holmes,* 336 Md. at 546, 649 A.2d at 371 (the allegations of fraudulent inducement "go to the validity of the contract as a whole," and as such, "run to the merits of the dispute between the parties and do not suggest a 'substantial and bona fide dispute' as to the actual existence of an arbitration agreement between the parties"); *Nowak,* 157 Md.App. at 34, 848 A.2d at 711 ("[The] argument [that the agreement is no longer valid because employment was terminated] clearly goes to the merits of the contract as a whole and is a question for the arbitrator to decide."); *Balt. v. Balt. Fire Fighters, Local 734, I.A.F.F.,* 93 Md.App. 604, 613–14, 613 A.2d 1023, 1027–28 (1992) ("[T]he essence of the City's argument on this point is that the Unions' claims are not

meritorious, *i.e.*, the Unions have not demonstrated any 'right' to the benefits they claim. This is an argument to be made to the arbitrator; it is not a consideration in determining whether a dispute is arbitrable."). Thus, because both the arbitrability and the merits of FOP's grievance depend on whether retirees' rights in the 85/15 health-insurance premium split vested prior to the MOU's expiration, we conclude that in this case the issue of whether FOP's grievance was arbitrable was an issue for the arbitrator to decide in the first instance.

This holding does not take away from the courts the authority to determine the threshold issue of whether the parties agreed to arbitrate their disputes. Courts are tasked with determining arbitrability issues to ensure that only parties who agreed to go to arbitration are compelled to do so. *Messersmith, Inc.*, 313 Md. at 652, 547 A.2d at 1052. In this case, the County and FOP have expressed their confidence in the arbitration process and indicated their preference for the arbitral, rather than judicial, forum by agreeing that "any disputes" not settled through a grievance procedure be subject to "binding arbitration." Although subsequently to that agreement to arbitrate, the underlying agreement expired, that fact has "little impact on many of the considerations behind [the parties'] decision to resolve their contractual differences through arbitration" in the first place. *Nolde*, 430 U.S. at 254, 97 S.Ct. at 1073. Thus, our holding is limited to cases like this one, where we have a broad arbitration clause, and the arbitrability issue hinges on the interpretation of the underlying agreement and the merits of the dispute.

## III.

### Summary Judgment in this Case

We finally turn to the Circuit Court's rulings in this case. The Circuit Court entered summary judgment in FOP's favor and against the County, finding that FOP's grievance was arbitrable and that FOP was entitled to judgment as a matter of law. Before we analyze the court's rulings, however, we

take another detour and make clear what standard of review we must apply.

## A. Standard of Review

Neither in their briefs nor in oral arguments were the parties clear on what standard of review governs this case. FOP did not address this issue in its brief but at oral argument conceded that questions of substantive arbitrability, *i.e.* whether an agreement to arbitrate exists or whether an arbitration clause governs the dispute in question, are subject to a non-deferential standard of review. In contrast, issues that go to the merits of the dispute, such as whether the right to a certain health-insurance premium split is a "vested" right, are subject to a deferential standard of review.

The County advocated a different approach: it analogized the "review" of arbitration awards to judicial review of administrative decisions.[23] Citing a number of cases reviewing decisions of administrative agencies without explaining their relevance, the County maintained: "[a]lthough the judicial act being appealed is the Circuit Court's Order granting summary judgment to FOP, this court should look not so much at the Circuit Court Order as through it to the July 15, 2008 Award of the Arbitrator." The County continued, "a review on the ultimate merits is now being conducted by the appellate court. The court is not reviewing the procedural correctness of the earlier review by the circuit court. It is undertaking its own de novo review of the earlier administrative decisions."

The parties' arguments are misplaced. It is true that most jurisdictional conclusions, *i.e.* that a dispute is arbitrable, are reserved for the courts in the first instance, and arbitrators' findings in that regard are typically subject to non-deferential review by a court. *Messersmith, Inc.,* 313 Md.

---

**23.** The County did not produce a standard of review in its brief to this Court but incorporated by reference the standard of review it placed in its Court of Special Appeals' brief. Had the County reproduced the standard of review here, it might have realized that the standard of review it proposed to the Court of Special Appeals was incorrect.

at 663, 547 A.2d at 1053. Moreover, when it comes to the merits of the parties' claims, "mere errors of law or fact would not ordinarily furnish grounds for a court to vacate or to refuse enforcement of an arbitration award." *Prince George's Cnty. Educators' Ass'n*, 309 Md. at 99, 522 A.2d at 937.

But, as we have recently explained, "[w]hen it comes to appellate procedure, . . . the standard of review in either this Court or the Court of Special Appeals is determined by the circuit court's disposition of the matter." *Montgomery Cnty. v. Fraternal Order of Police*, 427 Md. 561, 571, 50 A.3d 579, 585 (2012). For example, in *Montgomery County*, one of our most recent cases involving arbitration, the circuit court reviewed the arbitrator's determination of arbitrability de novo, granting summary judgment on the matter. 427 Md. at 572, 50 A.3d at 585. When the dispute reached this Court, however, we did not review the arbitrator's determination anew but instead "review[ed] the circuit court's disposition for legal error," which is the proper standard of review for summary judgment dispositions.[24] *Id.* (citing *Messing v. Bank of Am., N.A.*, 373 Md. 672, 684, 821 A.2d 22, 28 (2003) ("The standard of review of a trial court's grant of a motion for summary judgment on the law is . . . whether the trial court's legal conclusions were legally correct.")).

The same standard of review applies in this case. Our task is limited to ensuring that, in granting summary judgment in favor of FOP and against the County, the Circuit

---

**24.** Likewise, in *Messersmith, Inc.*, which is frequently quoted for the de novo standard of review, when we said that the reviewing court may base its decision to stay an arbitration proceeding "upon its independent assessment of the evidence," we were not speaking of this Court or the intermediate appellate court but were referring to the circuit court instead. 313 Md. at 663, 547 A.2d at 1053. Like in this case, in *Messersmith, Inc.*, the circuit court was actually faced with cross-motions for summary judgment, and on appeal, the Court of Special Appeals and this Court reviewed the circuit court's holding for legal error. *Montgomery Cnty. v. Fraternal Order of Police*, 427 Md. 561, 571, 50 A.3d 579, 585 (2012) (citing *Barclay Townhouse v. Messersmith, Inc.*, 67 Md.App. 493, 508 A.2d 507 (1986), *aff'd*, 313 Md. at 659, 547 A.2d at 1051).

Court's decision to leave undisturbed the arbitrator's findings was legally correct. In other words, we must make sure that FOP was entitled to judgment as a matter of law. *See Wash. Homes, Inc. v. Interstate Land Dev. Co.*, 281 Md. 712, 717, 382 A.2d 555, 557 (1978).

### B. The Circuit Court's Grant of Summary Judgment

Thus, the Circuit Court would be legally correct in granting summary judgment in FOP's favor, if (1) it reviewed the arbitrator's findings under a proper standard of review and (2) if FOP was entitled to judgment as a matter of law.

As the arbitrability of FOP's grievance was a decision to be initially made by the arbitrator, that decision was subject to the same deferential standard of review as the arbitrator's findings on the merits. Thus, the Circuit Court needed to make sure that both the arbitrator's findings (1) that FOP's grievance was arbitrable and (2) that FOP was entitled to relief did not constitute a "palpable mistake of law or fact apparent on the face of the award or a mistake so gross as to work manifest injustice." *Prince George's Cnty. Educators' Ass'n,* 309 Md. at 105, 522 A.2d at 941 (quotation marks omitted). Because the Circuit Court was unsure what standard to apply in reviewing the arbitrator's arbitrability finding, the Circuit Court subjected that finding to both a deferential and non-deferential standard of review. As for the award itself, the court "awarded great deference" to the arbitrator's findings. Accordingly, the Circuit Court applied a proper standard of review in both instances.

We now look to the arbitrator's findings to determine whether the Circuit Court was legally correct in granting summary judgment in FOP's favor. The arbitrator began his opinion by acknowledging the County's argument about the supposedly preclusive effect of the MOU's expiration on the arbitrability of FOP's grievance. Relying on *Nolde* and *Litton,* the arbitrator responded to the County's challenge by stating that "[t]he end of a labor contract, however, does not always signal the death of negotiated rights thereunder, in-

cluding the right to have a dispute over that matter resolved through arbitration." The arbitrator then discussed *Nolde* and *Litton* for their vesting principles and concluded that "the ultimate question is whether the retiree rights at issue may be considered vested and thus capable of continuing enforcement."

In the arbitrator's view, the question of vesting "is answered directly by the unequivocal language of the MOUs: The statement that 'the health insurance subsidy in place at the time of retirement shall remain in effect until the retiree becomes eligible for Medicare' is subject to no interpretation other than that here proposed by the FOP." He continued, "[w]hen the parties bargained this language, they made a binding promise to retirees that the subsidy would remain at whatever level existed at their retirement. That is a vested right, and it was not, and could not be, changed by the [subsequent] negotiations. . . ." The arbitrator concluded: "[o]fficers who retired on or after February 1, 1992 and before July 1, 2007 have a vested right to retain the health insurance split applicable to them as active officers at the time of their retirement."

The County attacks the arbitrator's findings on several fronts. In addition to arguing against the application of *Nolde* and *Litton* to this case, the County suggests that the "Arbitrator acknowledged, but did not address, the County's argument that all obligations under the Agreement expired, including both the healthcare obligations and the independent obligation to arbitrate." According to the County, this alleged failure to consider whether the arbitration clause had expired gives basis to vacate the arbitration award not only for a palpable mistake in law, but also for failure "to consider all matters submitted."

The County also argues that the healthcare subsidy was not a vested right. Here, the County asserts that "[t]here is no 'vested right' to future health insurance benefits and subsidies in the expired FY 2007 MOU, based on evidence, long-standing practice, and applicable law." In support of this state-

ment, the County mentions the Labor Commissioner's testimony, where he stated that "there is no vested right to health insurance benefits and there never has been such a right in Baltimore County." The County also points out that "there is no statutory requirement that County employees be provided with health care benefits."

The County's arguments are unavailing. First, we agree with FOP that "as a corollary to his express findings that the right had vested, and as a necessary precondition to his granting the grievance, the arbitrator necessarily determined that the arbitration clause was enforceable and that the grievance was arbitrable." The arbitrator's consideration of the arbitrability of the dispute and the merits of the case illustrates the interconnectedness of these two issues in cases where arbitrability depends on the interpretation of the underlying agreement. Having found that the retirees were entitled to the health-insurance premium split in effect at the time of their retirement, the arbitrator necessarily also found, by implication, that the arbitration clause survived the MOU's expiration, and the dispute was arbitrable. *See Nolde,* 430 U.S. at 249, 97 S.Ct. at 1071 ("[I]n determining the arbitrability of the dispute, the merits of the underlying claim for severance pay are not before us. However, it is clear that, whatever the outcome, the resolution of that claim hinges on the interpretation ultimately given the contract clause providing for severance pay."); *Litton,* 501 U.S. at 205–06, 111 S.Ct. at 2225 ("A postexpiration grievance can be said to arise under the contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.").

Second, like the Circuit Court, we see no reason to disturb the arbitrator's finding of vesting. The County's arguments on the lack of county employees' statutory entitlement to health care based on Commissioner Gay's testimony simply miss the point. The arbitrator found that the rights had

vested based on his interpretation of the underlying MOU, which stated that "the health insurance subsidy in place at the time of retirement shall remain in effect until the retiree becomes eligible for Medicare." We do not think that the arbitrator's reading of this clause as a "binding promise" constituted a "manifest disregard of the law" or resulted in "manifest injustice." *Prince George's Cnty. Educators' Ass'n,* 309 Md. at 105, 522 A.2d at 941. On the contrary, we agree with the Circuit Court that the arbitrator's interpretation of this language was consistent with the objective theory of contract interpretation that Maryland adheres to, under which courts give primary effect to the terms of the agreement. *Cochran v. Norkunas,* 398 Md. 1, 16, 919 A.2d 700, 709 (2007).

██ In any event, the arbitrator's findings are awarded a great deal of deference and should not be disturbed, unless the arbitrator demonstrates a "manifest disregard of the law ... beyond and different from a mere error in the law or failure on the part of the arbitrator[ ] to understand or apply the law." *Prince George's Cnty. Educators' Ass'n,* 309 Md. at 102, 522 A.2d at 939. Since we see no such mistakes here, we conclude that the Circuit Court correctly determined that FOP was entitled to judgment as a matter of law. Thus, we reverse the judgment of the Court of Special Appeals.

## Conclusion

We agree with the Circuit Court's decision to leave undisturbed the arbitrator's findings in this case. The fact that the MOU has expired does not mean the County had no duty to arbitrate disputes arising out of that MOU. A dispute may be arbitrable after the expiration of the underlying agreement, if the agreement contained a broad arbitration clause and the rights that are the subject of the dispute accrued or vested during the life of the agreement.

The MOU's arbitration clause was broad. It did not exclude grievances arising after the expiration of the MOU but pertained to "[a]ny dispute concerning the application or interpretation" of the MOU. The arbitrator found that FOP's

grievance was arbitrable even after the MOU's expiration because—based on the arbitrator's reading of the MOU's health-insurance clause—retirees' rights to an 85/15 health-insurance premium split had vested at the time of their retirement. The Circuit Court was legally correct in granting summary judgment in FOP's favor after subjecting the arbitrator's findings to a deferential standard of review. Thus, we reverse the judgment of the Court of Special Appeals.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.